Case 1:23-cr-00110-MKV    Document 347    Filed 10/22/24    Page 1 of 9



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 22, 2024

**BY ECF**
Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Jonathan Gavrielof*, S3 23 Cr. 110 (MKV)

Dear Judge Vyskocil:

      The Government respectfully submits this letter in advance of sentencing in this matter for defendant Jonathan Gavrielof (the "defendant"), which is scheduled for October 29, 2024. The defendant participated in a massive fraud that generated tens of millions of dollars in profits by exploiting vulnerable patients with HIV, in particular by trafficking large-scale quantities of black-market medication, and also by managing one of the many pharmacies through which this sprawling fraud was perpetrated. In consideration of the gravity of the offense, the need for the sentence imposed to provide significant deterrence, and the other factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a sentence within the stipulated Guidelines range is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

    **A. Background**

        i. <u>The Offense Conduct</u>

           a. *Overview of the Offenses*

      From at least in or about 2017 through at least in or about 2023, the defendant participated in a scheme that defrauded Medicaid, Medicare, and private insurance companies out of at least approximately $20 million through trafficking in black-market HIV medication. The defendant, who frequently helped co-defendants Boris Aminov and Roman Shamalov procure black market medication, was a major supplier of that diverted medication to numerous pharmacies and other individuals who acted as fake "wholesalers" by then selling this black-market medication to pharmacies. As the Court is aware, those pharmacies then profited by charging Government insurance the full price for medication they obtained at a steep discount. In addition, the defendant worked as a manager at Bless You Rx, a pharmacy owned by co-defendant Boris Aminov, and one of the pharmacies from which the scheme was perpetrated. (*See* Final Presentence Investigation Report dated May 21 2024 ("PSR") ¶¶ 20, 21).

### b. *Background of the Regulation and Distribution of Prescription HIV Medication*

Prescription medications are of critical importance to treating many types of diseases, including HIV, and therefore, the movement, storage, and sale of these medications is carefully regulated. To ensure their safety, prescription drugs are typically sent from the manufacturer to one of only a handful of authorized wholesale distributors, who, in turn, either sell the prescription medications directly to pharmacies, or sell those medications to other licensed wholesale distributors who sell the medications to pharmacies for ultimate distribution to patients.

Prescription drug manufacturers set careful standards for the safe handling of prescription medications. For example: many HIV medications must be stored at precise temperatures. And on a more basic level, patients must never be given medication that is expired or that has already been dispensed to another individual. These standards must be upheld by all distributors who handle, buy, and sell prescription medication along the traditional drug supply chain. Failure to comply with these standards can impact the efficacy of the drugs and the safety of the patients receiving them. Maintaining the integrity of the prescription drug supply chain is, therefore, critical to ensuring that all prescription drugs remain safe for human consumption by the time they are ultimately distributed to patients.

The United States Food and Drug Administration ("FDA") is charged with protecting the health and safety of the American public, including by regulating the manufacture, distribution, and dispensation of prescription drugs. The FDA regulates the manufacture, distribution, and dispensation of prescription drugs through a number of laws, including the Food, Drug, and Cosmetic Act ("FDCA"), the Drug Supply Chain Security Act ("DSCSA"), and the Prescription Drug Marketing Act ("PDMA").

In addition to regulation of the prescription drug supply chain, the price paid for prescription drugs is also carefully controlled. Drug manufacturers generally set a Wholesale Acquisition Cost ("WAC") for the prescription medication they sell, that is, a price they charge wholesale distributors before the application of any rebates, discounts, allowances, and other price concessions. There is little deviation from the WAC for name brand, non-generic drugs that remain under patent. For this reason, drug distributors or dispensers who purchase prescription medication from the legitimate, regulated drug supply chain are generally unable to purchase that medication for substantially lower than the WAC.

Prescription drug distributors and dispensers are generally only able to purchase drugs at prices significantly below the WAC when they obtain those drugs illegally—that is, through means outside the legitimate, regulated drug supply chain. The term prescription drug "diversion" describes prescription drugs that are removed or "diverted" from the chain of lawful manufacturers, distributors, and dispensers. Prescription drug diversion typically occurs through several different unlawful means, including theft, fraud, or purchases also known as "buy-backs" from individual patients who never consumed the drugs they were prescribed. Diverted prescription drugs are often obtained and unlawfully resold by unlicensed distributors to other unlicensed distributors, or directly to pharmacies, who ultimately dispense the diverted medication to patients.

By purchasing diverted medication, wholesale distributors and dispensers, such as pharmacies, are often able to obtain prescription drugs for substantially less than the WAC. However, when pharmacies submit a claim to Medicare or Medicaid, they receive the same amount of money in reimbursement—generally a payment at or near the stated WAC for a particular prescription drug—regardless of what they ultimately paid for the prescription drug. Purchasing diverted medication at lower cost outside the regulated supply chain therefore enables the pharmacy to earn a larger profit on each prescription medication it dispenses. In fact, the fraudulent scheme generated huge profits for the defendant, as one of the scheme's primary black-market medication wholesalers. It also generated huge profits for the pharmacies and those who controlled them; Medicare and Medicaid in some instances paid close to $3,000 for a bottle of HIV medication that the defendant and his co-conspirators might have obtained for only a fraction of that price.

Prescription drug diversion, while profitable for unscrupulous wholesale distributors and pharmacies, disrupts the integrity of the regulated prescription drug supply chain. When diversion occurs, the FDA is unable to properly monitor the manufacture, distribution, and dispensation of prescription drugs. Many diverted medications therefore lack indicia of authenticity or proper quality control. This lack of regulation puts patient health and safety at risk.

When enrolling in Medicare and Medicaid programs, pharmacies must attest that they will only submit insurance reimbursement claims for medication that was obtained and dispensed in full compliance with all applicable state and federal laws, including the FDCA and the DSCSA. However, the pharmacies involved in this fraud often billed government insurance (and sought full payment for) medication that was obtained outside the regulated supply chain and dispensed in violation of those applicable laws.

This diversion scheme had two sets of victims: government insurance programs and the patients of the pharmacies.

*First*, Medicaid and other government insurance programs were defrauded out of at least approximately $20 million in payments that they made to various pharmacies involved in this scheme, including Bless You Rx (where, as described throughout this letter, the defendant worked as a manager), and the Corvalan, Polvanova, and Shamalov Pharmacies that are described in the S1 Superseding Indictment. Medicaid and other government insurance programs paid these pharmacies based on false representations by the pharmacies that the medication for which they were seeking reimbursement was procured and distributed in compliance with all applicable federal and state laws, including the FDCA and the DSCSA.

*Second*, the scheme exploited low-income HIV patients of these pharmacies, and in the process, potentially put those vulnerable patients' health and safety at risk. Modern HIV medication is very effective at controlling the symptoms of HIV. However, effective HIV treatment requires strict adherence to a prescribed medication regimen, with patients needing to take specific doses of specific medications each month. By purchasing diverted HIV medication from black-market sources instead of through legitimate distributors, the pharmacies could not assure the quality or condition of the medication they provided to their patients, thereby creating a risk that patients would receive counterfeit, expired, or improperly dosed medication.

*c. The Defendant's Role in the Scheme*

This scheme was made possible because several of the defendants—including Gavrielof—procured black market HIV medication from illegitimate sources in large quantities so that pharmacies could then charge Medicare and Medicaid full price for that heavily discounted medication. The Government's investigation revealed that the defendant acquired this medication from a few different sources—including overseas—before ultimately selling it to Boris Aminov and others. Much of the medication dispensed from the Corvalan, Polvanova and Shamalov pharmacies described in the S1 Superseding Indictment came from the defendant.

The defendant—who was saved in Aminov's phone as "Jonathan Pharmacy"—communicated with Aminov regularly regarding Aminov's need for black-market HIV medication. In the WhatsApp message below, the defendant sent pictures of black-market HIV medications, along with a list of such medications, to Aminov after Aminov had informed the defendant that he was in need of more diverted medication. The medication bottles pictured in the defendant's picture are visibly adulterated, indicating that they had been "bought back" from patients:






In another example below, the defendant provided Aminov with a breakdown of the HIV medication that he and the defendant sold together:



In addition to distributing medication on a major scale, the defendant also worked from 2021 through 2022 as a manager at Bless You Rx, a pharmacy owned by Boris Aminov's mother but functionally operated by Aminov himself. In that role, the defendant also played a part in the next phase of the scheme: billing Medicare and Medicaid for diverted medication and ultimately distributing that diverted medication to patients.

The total loss amount attributable to the defendant is at least $2,200,747.00. Much of that loss amount is derived from the fraud committed through Bless You Rx when the defendant was the manager—that is, the discrepancy between what the pharmacy billed to Medicare and Medicaid for HIV medication and the actual amount of HIV medication the pharmacy purchased from legitimate medication wholesalers. The loss amount also accounts for some of the black-market HIV medication the defendant supplied to other pharmacies, including those owned by Polvanova, Corvalan, and Shamalov, although it is impossible to discern the exact scale of the defendant's black-market medication business.

### iii. Procedural History

On October 17, 2023, a grand jury returned a superseding indictment charging the defendant with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Six other co-defendants were indicted, including Polvanova and Shamalov. Several defendants, including Boris Aminov and Christy Corvalan, had been charged in March of 2023.

On February 29, 2024, the defendant pleaded guilty to Count One of an S3 Superseding Information charging him with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, pursuant to a plea agreement with the Government (the "Plea Agreement"). As part of the Plea Agreement, the defendant stipulated that he caused patients with HIV to receive illegally-sourced, black-market prescription HIV medication, and that the Court may consider that conduct in imposing a sentence.

The Plea Agreement calculated a Guidelines range of 57 to 71 months' imprisonment, based on an offense level of 25 and a criminal history category of I. The Guidelines range included a stipulated loss amount of $2,200,747.00. The Plea Agreement also contains an enhancement because the scheme involved a large number of vulnerable victims—that is, patients with HIV.

On May 21, 2024, the United States Probation Office ("Probation") issued its final PSR for the defendant. That report calculated the same Guidelines Range and Stipulated Guidelines Sentence as that contained in the Plea Agreement. Probation recommends a sentence of 24 months' imprisonment.

## B. Discussion

### i. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme

Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

ii. <u>A Guidelines Sentence Is Appropriate</u>

The Court should impose a sentence within the stipulated Guidelines range. Such a sentence is necessary given the seriousness of the offense, the need to promote respect for the law and to provide just punishment, to afford adequate deterrence to criminal conduct, and in consideration of the characteristics of the defendant.

For years, the defendant trafficked in counterfeit HIV medication and in doing so defrauded Medicaid and Medicare of millions of dollars. In assessing the seriousness of the offense and the need to promote respect for the law, the Court should first consider the harm inflicted on the victims. The more easily calculated harm is to the Government, whose health insurance programs were defrauded of at least $20 million. When individuals defraud these programs, Medicare and Medicaid are left with fewer resources to accomplish their important goal of providing prescription drugs and medical care to some of this country's most vulnerable populations. But the Court must also consider the harm to the many HIV patients who, throughout the course of this scheme, were convinced to forego taking their life-saving medication in exchange for just a few hundred dollars—that is, a fraction of the amount the defendants ultimately profited from that same bottle of medication. Participants in this scheme frequently encouraged these vulnerable patients to sell back their medication, as the conspiracy was only as profitable as the next reclaimed (and

subsequently re-distributed) bottle. The defendant did not appear to be a street aggregator himself, but instead acted as a middleman between the aggregators and individuals like Aminov, who, as the Court knows, operated a massive and sprawling black-market "wholesale" business. The Government's investigation also revealed that the defendant frequently procured all sorts of black-market medication (both HIV and non-HIV) from overseas before re-selling that medication at a substantial profit. And in collecting medication to re-distribute to pharmacies, the defendant jeopardized the health and safety of the many sick (and often poor) patients who skipped their monthly dose of medication in order to make a little bit of extra money. The defendant—both directly in his role as a pharmacy manager and indirectly as a distributor of this medication—also jeopardized the health and safety of the many HIV patients who were then unknowingly prescribed this diverted medication. As described above, this medication was often tampered with or expired when it reached individuals like the defendant. Participants in the scheme, including Aminov, then adulterated the bottles to look new so that the next patient to receive the medication would not know the difference.

This sprawling scheme lasted for years, likely because the defendant and others worked scrupulously to obscure their fraud from Medicare and Medicaid. For one, the pharmacies often closed and then re-opened under new names before Medicare or Medicaid could realize the extent to which they had been fraudulently overbilled. The defendant and others also engaged in a highly sophisticated scheme by which they purchased and billed for a certain amount of legitimate HIV medication in the hope that doing so would allow them to stay under the radar of Government insurance programs. Those involved with managing pharmacies—including the defendant—therefore had to strike a careful balance between purchasing enough real medication in order to make the pharmacies appear legitimate while also trafficking in enough diverted medication such that the scheme could remain massively profitable. In fact, the Government's investigation revealed that the defendant developed a particularly sophisticated system for inventorying HIV medication at Bless You Rx in order to avoid law enforcement detection, including by regularly monitoring the amount of legitimate medication the pharmacy purchased in order to meet insurance carrier audit requirements. In addition, the defendant also attempted to open his own pharmacy shortly before he was charged, presumably in order to facilitate his participation in this fraud.

Given the huge scale of Government insurance programs, healthcare fraud schemes unfortunately carry potential for millions of dollars in fraudulent profit. Similarly, given the challenges with administering programs of this scale, fraud can often go undetected for long periods of time. A substantial sentence is necessary in order to deter such conduct in the future, both as a matter of specific and general deterrence. Healthcare fraud schemes remain attractive to sophisticated criminals precisely because individuals are able to steal millions of dollars from the Government over the course of only a few months or years before (or without ever) being caught. The defendant's sentence must send a message that no matter the potential profit, these schemes should be avoided because they are likely to result in substantial prison time.

A Guidelines sentence would also avoid any unwanted sentencing disparities. As the Court knows, although all defendants in this case have pled guilty, only one, Boris Aminov, has been sentenced. Aminov's Guidelines sentence was 120 months' imprisonment, or the statutory

maximum sentence. Gavrielof's Guidelines are substantially lower, mainly because Gavrielof's conduct was directly connected to a smaller portion of the conspiracy's ultimate fraudulent profit.

**C. Conclusion**

The defendant's sentence must reflect the uniquely harmful fraud that he participated in, including the harm to both taxpayers who fund Government insurance programs and individuals who received black-market drugs. It also must provide adequate deterrence to those who contemplate similar harmful conduct that exploits vulnerable individuals in need of prescription drugs or medical care. A Guidelines is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.[1]

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: _____
Jackie Delligatti/Jeffrey W. Coyle
Assistant United States Attorneys
(212) 637-2559/2437

Cc:   Matin Emouna, Esq. (by ECF)

---

[1] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g., United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).